[No. S071633. Aug. 16, 1999.]

LEO NORGART, Individually and as Administrator, etc., et al., Plaintiffs and Appellants, v.
THE UPJOHN COMPANY, Defendant and Respondent.

**COUNSEL**

Peter Ticktin & Associates, Peter Ticktin, Caron Speas; and Marc Stern for Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold, Michael F. Healy, Frederick D. Baker, Kathryn H. Edwards and Kirk C. Jenkins for Defendant and Respondent.

Hugh F. Young, Jr.; and Harvey M. Grossman for the Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendant and Respondent.

Haight, Brown & Bonesteel, Roy G. Weatherup, William J. Sayers and Caroline E. Chan for the Center for Claims Resolution as Amicus Curiae on behalf of Defendant and Respondent.

Horvitz & Levy, Frederic D. Cohen and Wendy S. Albers for California Medical Association, California Dental Association and California Healthcare Association as Amici Curiae.

## Opinion

MOSK, J.—Under the statute of limitations, a plaintiff must bring a cause of action within the limitations period applicable thereto after accrual of the cause of action. The general rule for defining the accrual of a cause of action sets the date as the time when the cause of action is complete with all of its elements. An exception is the discovery rule, which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action, until, that is, he at least suspects, or has reason to suspect, a factual basis for its elements.

We granted review to address questions concerning the statute of limitations in the setting of the "controversial" prescription hypnotic or sleeping drug Halcion. (*Ballan* v. *Upjohn Co.* (W.D.Mich. 1994) 159 F.R.D. 473, 477; see, e.g., *Carlin* v. *Superior Court* (1996) 13 Cal.4th 1104, 1109 [56 Cal.Rptr.2d 162, 920 P.2d 1347].)

I

The factual background and procedural history of the action before us are each somewhat complex. The matters and events that are of consequence for present purposes may be summarized as follows.

On October 16, 1991, a complaint for damages was filed in the Superior Court of Sonoma County to initiate this action.

As subsequently, and finally, amended into its operative form, the complaint named as plaintiffs Leo and Phyllis Norgart, in their personal capacity, and Leo, in his capacity as administrator of the estate of their deceased adult daughter, Kristi Norgart McBride. It named as defendant The Upjohn Company, a manufacturer and distributor of pharmaceutical products, including

Halcion.[1] It purported to name as well Steven McBride, Kristi's husband, but did not make any allegations against him or pray for any relief from his hands.

In the operative complaint, the Norgarts brought causes of action against Upjohn for wrongful death—whose elements include (1) a "wrongful act or neglect" on the part of one or more persons that (2) "cause[s]" (3) the "death of [another] person" (Code Civ. Proc., § 377.60)—on legal theories of negligence and strict liability.

The Norgarts also brought causes of action against Upjohn for fraud, labeled "fraud" *simpliciter* and "conspiracy to commit fraud," that belonged to Kristi and survived her death.

Going to the core of the merits of all of their causes of action, the Norgarts alleged, in effect, that, on October 16, 1985, exactly six years before the action was initiated, Kristi had committed suicide in her home in Santa Rosa by means of an intentional overdose of prescription drugs including Halcion, which was not accompanied by adequate warnings and was, regardless of any possible warnings, "unreasonably dangerous," at least at higher dosage levels. In connection therewith, they attached as part of the pleading the package insert that Upjohn had prepared for Halcion, which, at all pertinent times, contained the following statement: "PRECAUTIONS"—"Caution should be exercised if HALCION is prescribed to patients with signs or symptoms of depression which could be intensified by hypnotic drugs. Suicidal tendencies may be present in such patients and protective measures may be required. Intentional overdosage is more common in these patients, and the least amount of drug that is feasible should be available to the patient at any one time."

In anticipation, and avoidance, of an affirmative defense by Upjohn based on the statute of limitations, which prescribed a limitations period of one year for causes of action for wrongful death (Code Civ. Proc., § 340, subd. (3)) and a limitations period of three years for causes of action for fraud (*id.*, § 338, subd. (d)), the Norgarts alleged, as follows, in order to invoke the doctrine that a defendant who has fraudulently concealed a cause of action may be equitably estopped from raising such a defense: Upjohn had "fraudulent[ly] conceal[ed]" Halcion's "dangerous propensities"; they "first learned," and were able to learn, "of such dangerous propensities on or about October 2, 1991," when, through Leo, they "discovered such propensities in accounts by the news media."

---

[1] Today, following a merger between The Upjohn Company and Pharmacia AB, what was then The Upjohn Company is now Pharmacia & Upjohn Company.

Upjohn answered the operative complaint. It denied all of the Norgarts' allegations. It also asserted numerous affirmative defenses, including one based on the statute of limitations.

Subsequently, Upjohn moved the superior court for summary judgment against the operative complaint, claiming that there was no triable issue of material fact and that it was entitled to judgment as a matter of law based on the statute of limitations.

Upjohn had previously made a similar summary judgment motion against a previous but similar complaint, in which the Norgarts had brought causes of action for wrongful death, but had not yet brought any "survival" causes of action for fraud.

In support of its previous summary judgment motion, Upjohn had argued that, under the undisputed facts, the Norgarts had to, but did not, bring their causes of action for wrongful death within one year of accrual, which occurred, under the general rule, at Kristi's death on October 16, 1985, or, under the discovery rule, at some date prior to mid-1986, when they came at least to suspect, or have reason to suspect, a factual basis for the elements of these claims by at least suspecting, or having reason to suspect, that someone had done her some wrong to cause her death.

Considered in light of the evidence from which they were drawn, including, notably, a deposition by Leo, the facts that Upjohn had stated were undisputed for purposes of its previous summary judgment motion—and that the Norgarts would subsequently admit to be such—were in substance as follows:

In April 1984, Kristi attempted suicide. Later that month, she entered into the care of Donald T. Apostle, M.D., a psychiatrist, who had originally been named as a defendant but was no longer. She was treated by Dr. Apostle for manic-depressive illness (now bipolar disorder), or perhaps more accurately depression, connected in part to her relationship with the Norgarts, her parents, and Steven, her husband, and was prescribed Xanax, an anti-anxiety agent, for its management. In November 1984, she entered into the care of Gary A. Greensweig, D.O., a general practitioner, who also had originally been named as a defendant but was no longer. In May 1985, she was treated by Dr. Greensweig, and was prescribed Halcion, an hypnotic, evidently for insomnia. Later that month, she left Dr. Apostle's care. In August 1985, she was prescribed Halcion by Dr. Greensweig for a second time. At the end of that month, she again attempted suicide, this time by overdose of unidentified prescription drugs. In September 1985, she was prescribed Halcion by

Dr. Greensweig for a third time. On October 10, 1985, she was treated by Dr. Greensweig for a bruise to her left calf, which she had suffered in a physical altercation with Steven, and was prescribed Darvocet-N, a mild narcotic analgesic, evidently for pain. On October 15, 1985, she was prescribed Halcion by Dr. Greensweig for a fourth time and Darvocet-N for a second time. On October 16, 1985, descending into a severe depression, she committed suicide by overdose of prescription drugs; found near the bed in which her body was discovered were four empty drug bottles, two of Darvocet-N, which was determined to be the toxic agent, and two also of Halcion.

On October 17, 1985, having been informed of Kristi's death, the Norgarts arrived from out of state. Straightway, Leo undertook an investigation into Kristi's death and its cause. He would apparently keep Phyllis apprised of all from beginning to end. "At or around the time of Kristi's death," as he himself admitted, he "thought" that "there had to be some reason, other than just herself, that would cause her to commit suicide," that "there had to be some other force or action upon her that caused her to commit suicide . . . ." In his investigation, he soon learned of the facts related above by means including interviewing persons such as Dr. Apostle and Dr. Greensweig, and reviewing documents such as police and coroner's reports relating to Kristi's death and the certificate of death itself. In this matter, he involved Scott Foster, an attorney who was handling the probate of her estate.

Prior to mid-1986, Leo had formed a belief, as he himself admitted, that an "individual or individuals . . . did something wrong to [Kristi] that caused her to take her own life," and had begun to contemplate bringing an action for wrongful death. The "individual or individuals" in question, as he further admitted, were her husband Steven, for what he suspected was physical abuse, and her psychiatrist Dr. Apostle, for what he suspected was professional negligence. Also prior to mid-1986, he communicated with Attorney Foster in the premises; Foster recommended against initiating a wrongful death action, at least in part because he did not practice in the field; he offered, however, to provide referrals to attorneys who did; Leo did not pursue the matter.

Late in 1987, Leo sought to determine whether Dr. Apostle had prescribed Kristi lithium carbonate, which was used to treat manic episodes of manic-depressive illness, and if not, why not; to this end, he inquired of the pharmacies she had patronized concerning what prescription drugs, if any, she had obtained in addition to Halcion and Darvocet-N, and whether they included lithium carbonate; he was informed that she had obtained Halcion and Darvocet-N only and not lithium carbonate. In this matter, too, he involved Attorney Foster.

It was not, however, until October 16, 1991, exactly six years after Kristi's death, that this action was initiated.

The superior court had issued an order denying Upjohn's previous summary judgment motion. It reasoned to this effect: Under the discovery rule, which it determined was applicable here, the Norgarts came at least to suspect, or have reason to suspect, a factual basis for the elements of their causes of action for wrongful death only when they at least suspected, or had reason to suspect, that Upjohn had done Kristi some wrong to cause her death by manufacturing and distributing Halcion in spite of its allegedly "unreasonable dangerousness"; there was a triable issue of material fact as to when they came at least to entertain such a suspicion or to have reason to do so, for Upjohn "fail[ed] to produce any evidence that [they] had or could have gotten through sources available to them, information that could have linked Halcion to creating a depression which led to [Kristi's] death . . . ."

Relying on the package insert that it had prepared for Halcion, which contained just such "information" at all pertinent times, and on accounts in the popular press, which contained similar "information" as early as about mid-1988, Upjohn had moved the superior court for reconsideration of its denial of its previous summary judgment motion. The superior court issued an order granting reconsideration. But, at the same time, it issued another order again denying summary judgment. It reasoned to the same effect as before, but without reference to any failure on the part of Upjohn to produce evidence of "information" such as that which the package insert itself contained.

In moving for summary judgment against the operative complaint, Upjohn made an entirely new summary judgment motion as to the Norgarts' "survival" causes of action for fraud; in addition, it renewed its previous summary judgment motion as to their causes of action for wrongful death based "upon . . . new law" (Code Civ. Proc., § 1008, subd. (b)), including *Bristol-Myers Squibb Co.* v. *Superior Court* (1995) 32 Cal.App.4th 959 [38 Cal.Rptr.2d 298] (hereafter sometimes *Bristol-Myers Squibb*), which held, in substance, that, under the discovery rule, a plaintiff discovers, or has reason to discover, a cause of action as to all defendants when he at least suspects, or has reason to suspect, a factual basis for its elements as to any defendant.

Evidently in view of *Bristol-Myers Squibb*, which appeared to be dispositive, the Norgarts and Upjohn entered into an agreement, on the Norgarts' proposal, to resolve the proceedings in the superior court in Upjohn's favor following the superior court's tentative ruling on its summary judgment motion against the operative complaint, in order apparently to hasten review

in the Court of Appeal. If the tentative ruling was to grant the motion, the Norgarts would accept that determination as final. But if it was to deny the motion, they authorized Upjohn to submit the following stipulation: the superior court should grant Upjohn's summary judgment motion because there was no triable issue of material fact and it was entitled to judgment as a matter of law based on the statute of limitations, specifically the statute of limitations applicable to causes of action for wrongful death with its one-year limitations period, and should enter judgment in its favor accordingly. As for any subsequent appeal by the Norgarts, the stipulation, in effect, bound both the Norgarts and Upjohn to the facts that Upjohn had stated, and the Norgarts had admitted, were undisputed; it did not, however, bind either to the law, each being free to "assert the same legal arguments and objections before the Court of Appeal as were made" in the superior court; but it bound each not to "argue" that the other "is not an aggrieved party for purposes of appeal."

In due course, the superior court issued a tentative ruling to deny Upjohn's summary judgment motion against the operative complaint. As the Norgarts had authorized, Upjohn submitted the stipulation referred to above. Pursuant thereto, the superior court issued an order granting the summary motion in question on the basis described and entered judgment accordingly.

From the superior court's judgment, the Norgarts appealed to the Court of Appeal, First Appellate District. The matter was assigned to Division Three thereof.

In its judgment, annunciated in an opinion certified for publication, the Court of Appeal reversed. It reviewed the superior court's order granting Upjohn's summary judgment motion against the operative complaint independently. On such review, it overturned the ruling. It considered only the Norgarts' causes of action for wrongful death and not their "survival" causes of action for fraud. In doing so, it rejected the holding of *Bristol-Myers Squibb*, and instead held, in substance, that, under the discovery rule, when "there are potentially multiple" "unrelated" "concurring causes," a plaintiff discovers, or has reason to discover, a cause of action "based on a particular act of wrongdoing" by a particular defendant, only when he at least suspects, or has reason to suspect, that act of wrongdoing by that defendant. It declined to take into account the package insert that Upjohn had prepared for Halcion. It did so on an assertion that it was "only before the court on Upjohn's motion to reconsider the denial of its first motion for summary judgment and was not before the court on the motion that was granted."

On Upjohn's petition, we granted review. Subsequently, we specified the issue to be argued as whether the Norgarts' causes of action for wrongful

death were barred by the statute of limitations, and not their "survival" causes of action for fraud.

## II

As the years have gone over, in decisions including *Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93 [132 Cal.Rptr. 657, 553 P.2d 1129] (hereafter sometimes *Sanchez*), *Gutierrez* v. *Mofid* (1985) 39 Cal.3d 892 [218 Cal.Rptr. 313, 705 P.2d 886] (hereafter sometimes *Gutierrez*), *Jolly* v. *Eli Lilly & Co.* (1988) 44 Cal.3d 1103 [245 Cal.Rptr. 658, 751 P.2d 923] (hereafter sometimes *Jolly*), and *Bernson* v. *Browning-Ferris Industries* (1994) 7 Cal.4th 926 [30 Cal.Rptr.2d 440, 873 P.2d 613] (hereafter sometimes *Bernson*), we have on several occasions addressed several questions concerning the statute of limitations.

"Statute of limitations" is the "collective term . . . commonly applied to a great number of acts," or parts of acts, that "prescribe the periods beyond which" a plaintiff may not bring a cause of action. (3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 405, p. 509; accord, *Regents of University of California* v. *Superior Court* (1999) 20 Cal.4th 509, 532 [85 Cal.Rptr.2d 257, 976 P.2d 808].) It has as a purpose to protect defendants from the stale claims of dilatory plaintiffs. (E.g., *Regents of University of California* v. *Superior Court, supra,* 20 Cal.4th at p. 532; *Bernson* v. *Browning-Ferris Industries, supra,* 7 Cal.4th at p. 935; *Kane* v. *Cook* (1857) 8 Cal. 449, 458; 3 Witkin, Cal. Procedure, *supra,* Actions, § 691, p. 882; see, e.g., *Pashley* v. *Pacific Elec. Ry. Co.* (1944) 25 Cal.2d 226, 228-229 [153 P.2d 325].) It has as a related purpose to stimulate plaintiffs to assert fresh claims against defendants in a diligent fashion. (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at p. 1112; see, e.g., *Bernson* v. *Browning-Ferris Industries, supra,* 7 Cal.4th at p. 935; *Shain* v. *Sresovich* (1894) 104 Cal. 402, 406 [38 P. 51].) Inasmuch as it "necessarily fix[es]" a "definite period[] of time" (*California Sav. etc. Soc.* v. *Culver* (1899) 127 Cal. 107, 110 [59 P. 292]), it operates conclusively across the board, and not flexibly on a case-by-case basis. (See, e.g., *Castro* v. *Sacramento County Fire Protection Dist.* (1996) 47 Cal.App.4th 927, 930 [55 Cal.Rptr.2d 193]; *California Standardbred Sires Stakes Com., Inc.* v. *California Horse Racing Bd.* (1991) 231 Cal.App.3d 751, 756 [282 Cal.Rptr. 656]; *Sinetos* v. *Department of Motor Vehicles* (1984) 160 Cal.App.3d 1172, 1175 [207 Cal.Rptr. 207]; *Kupka* v. *Board of Administration* (1981) 122 Cal.App.3d 791, 794-795 [176 Cal.Rptr. 214].) That is to say, a cause of action brought by a plaintiff within the limitations period applicable thereto is not barred, even if, in fact, the former is stale and the latter dilatory; contrariwise, a cause of action brought by a plaintiff outside such period is barred, even if, in fact, the former is fresh and the latter diligent.

■ The statute of limitations operates in an action as an affirmative defense. (E.g., *Adams* v. *Paul* (1995) 11 Cal.4th 583, 597 [46 Cal.Rptr.2d 594, 904 P.2d 1205]; *Fuller* v. *White* (1948) 33 Cal.2d 236, 240 [201 P.2d 16]; see generally, 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, §§ 1043-1047, pp. 491-498.)

Most often (see 3 Witkin, Cal. Procedure, *supra*, Actions, §§ 408-409, pp. 513-516), the affirmative defense based on the statute of limitations has been approved by courts as "favored" (e.g., *Adams* v. *Paul, supra*, 11 Cal.4th at p. 592; *Scheas* v. *Robertson* (1951) 38 Cal.2d 119, 125 [238 P.2d 982]; *Fontana Land Co.* v. *Laughlin* (1926) 199 Cal. 625, 636 [250 P. 669, 48 A.L.R. 1308]; *Shain* v. *Sresovich, supra*, 104 Cal. at p. 406). That is because, in accord with "public policy" (*Wood* v. *Carpenter* (1879) 101 U.S. (11 Otto.) 135, 139 [25 L.Ed. 807, 808], quoted in *Shain* v. *Sresovich, supra*, 104 Cal. at p. 406), it "promote[s] repose by giving security and stability to human affairs" (*Wood* v. *Carpenter, supra*, 101 U.S. (11 Otto.) at p. 139 [25 L.Ed. at p. 808], quoted in *Shain* v. *Sresovich, supra*, 104 Cal. at p. 406).

Less often (see 3 Witkin, Cal. Procedure, *supra*, Actions, § 411, pp. 518-520), the affirmative defense based on the statute of limitations has been disparaged by courts as "disfavored" (e.g., *Barrington* v. *A.H. Robins Co.* (1985) 39 Cal.3d 146, 152 [216 Cal.Rptr. 405, 702 P.2d 563]). That is because, contrary to "public policy" (*ibid.*), it buys repose at the price of disposing of a cause of action "on procedural grounds" rather than "on the merits" (*ibid.*)—and, in a given case, may buy it at the price of procedurally barring a cause of action that is in fact meritorious (see, e.g., *Bollinger* v. *National Fire Ins. Co.* (1944) 25 Cal.2d 399, 411 [154 P.2d 399] [stating that it might "enable" a defendant "to obtain an unconscionable advantage and enforce a forfeiture"]; *California Sav. etc. Soc.* v. *Culver, supra*, 127 Cal. at pp. 110-111 [stating that it might prove "unjust and unconscionable"]).

Perhaps, to speak more accurately, the affirmative defense based on the statute of limitations should not be characterized by courts as either "favored" or "disfavored." The two public policies identified above—the one for repose and the other for disposition on the merits—are equally strong, the one being no less important or substantial than the other. (*Braham* v. *Sorenson* (1981) 119 Cal.App.3d 367, 373 [174 Cal.Rptr. 39], disapproved on another point in *Woods* v. *Young* (1991) 53 Cal.3d 315, 328, fn. 4 [279 Cal.Rptr. 613, 807 P.2d 455]; *Scherer* v. *Mark* (1976) 64 Cal.App.3d 834, 844 [135 Cal.Rptr. 90].) To establish any particular limitations period under any particular statute of limitations entails the striking of a balance between the two. To establish any such period under any such statute belongs to the Legislature alone (*Weinberger* v. *Weidman* (1901) 134 Cal. 599, 602 [66 P.

869]), subject only to constitutional constraints (see *Regents of University of California* v. *Superior Court, supra,* 20 Cal.4th at p. 534).

■ Under the statute of limitations, a plaintiff must bring a cause of action within the limitations period applicable thereto after accrual of the cause of action. (Code Civ. Proc., § 312; see generally, 3 Witkin, Cal. Procedure, *supra,* Actions, § 459, pp. 580-581.)

The general rule for defining the accrual of a cause of action sets the date as the time "when, under the substantive law, the wrongful act is done," or the wrongful result occurs, and the consequent "liability arises." (3 Witkin, Cal. Procedure, *supra,* Actions, § 459, p. 580, italics omitted.) In other words, it sets the date as the time when the cause of action is complete with all of its elements (see *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 187 [98 Cal.Rptr. 837, 491 P.2d 421] [stating that "[i]n ordinary . . . actions, the statute of limitations . . . begins to run upon the occurrence of the last element essential to the cause of action"]; *Gutierrez* v. *Mofid, supra,* 39 Cal.3d at p. 899 [quoting the foregoing statement approvingly])—the elements being generically referred to by sets of terms such as "wrongdoing" or "wrongful conduct," "cause" or "causation," and "harm" or "injury" (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at pp. 1107, 1109, 1110, 1112, 1113, & 1114; accord, *Bernson* v. *Browning-Ferris Industries, supra,* 7 Cal.4th at pp. 931 & 932; *Gutierrez* v. *Mofid, supra,* 39 Cal.3d at pp. 897-898).

An exception to the general rule for defining the accrual of a cause of action—indeed, the "most important" one—is the discovery rule. (3 Witkin, Cal. Procedure, *supra,* Actions, § 463, p. 583.) It may be expressed by the Legislature or implied by the courts. (*Ibid.*) It postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. (*Ibid.*; see *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand, supra,* 6 Cal.3d at p. 179 [postponing accrual "until the [plaintiff] discovers, or should discover, his cause of action"].)

■ Under *Jolly,* which relies on decisions such as *Gutierrez* and *Sanchez,* the plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least "suspects . . . that someone has done something wrong" to him (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at p. 1110), "wrong" being used, not in any technical sense, but rather

in accordance with its "lay understanding" (*id.* at p. 1110, fn. 7).[2] He has reason to discover the cause of action when he has reason at least to suspect a factual basis for its elements. (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at p. 1110.) He has reason to suspect when he has " ' " " 'notice or information of circumstances to put a reasonable person *on inquiry*' " ' " (*id.* at pp. 1110-1111, italics in original); he need not know the "specific 'facts' necessary to establish" the cause of action; rather, he may seek to learn such facts through the "process contemplated by pretrial discovery"; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place—he "cannot wait for" them "to find" him and "sit on" his "rights"; he "must go find" them himself if he can and "file suit" if he does (*id.* at p. 1111).[3]

In this connection, *Jolly* recognizes the effect of Code of Civil Procedure sections 474 and 583.210, subdivision (a). Section 474 provides that, "[w]hen the plaintiff is ignorant of the name of a defendant, he must state that fact in the complaint . . . , and such defendant may be designated . . . by any name," customarily "Doe," and "when his true name is discovered," the complaint "must be amended accordingly . . . ." For its part, section 583.210, subdivision (a), provides that the "complaint shall be served upon a defendant within three years" of its filing. Hence, the plaintiff can "file[] a timely complaint under section 474 . . . . From the time such a complaint is filed," under section 583.210, subdivision (a), he "has three years," and the machinery of discovery, "to identify . . . the defendant," amend the complaint, and "serve [him] . . . , effectively enlarging the . . . limitations period for three years" through the doctrine that the amended complaint "relates back" to the original one. (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at p. 1118.)

---

[2]See *Gutierrez* v. *Mofid, supra,* 39 Cal.3d at pages 897-898: "[T]he uniform California rule is that a limitations period dependent on discovery of the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the *facts* essential to his claim. [Citations.] It is irrelevant that the plaintiff is ignorant of . . . the legal theories underlying his cause of action. Thus, if one has suffered appreciable harm and knows or suspects that . . . blundering is its cause, the fact that an attorney has not yet advised him does not postpone commencement of the limitations period." (Italics in original.)

[3]Not inconsistent with the proposition that the plaintiff discovers the cause of action when he at least suspects a factual basis for its elements, even if he lacks knowledge thereof, is language like that which appears in *Jolly,* to the effect that a "suspicion" of one or more of the elements of a cause of action, "coupled with a knowledge" of the others, "will commence the [applicable] limitations period." (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at p. 1112, italics omitted.) Such words do not cast doubt on the sufficiency of suspicion of the elements of a cause of action *without* knowledge. To quote *Jolly* again: A plaintiff need not know the "specific 'facts' necessary to establish" the cause of action. (*Id.* at p. 1111.) Rather, such words merely make plain what is true a fortiori—the sufficiency of suspicion of one or more of the elements *with* knowledge of the others.

██  Under *Bernson*, which relies on decisions such as *Jolly*, the plaintiff may discover, or have reason to discover, the cause of action even if he does not suspect, or have reason to suspect, the identity of the defendant. (*Bernson* v. *Browning-Ferris Industries, supra*, 7 Cal.4th at p. 932.)[4] That is because the identity of the defendant is not an element of any cause of action. (See *Bernson* v. *Browning-Ferris Industries, supra*, 7 Cal.4th at p. 932.) It follows that failure to discover, or have reason to discover, the identity of the defendant does not postpone the accrual of a cause of action, whereas a like failure concerning the cause of action itself does. "Although never fully articulated, the rationale for distinguishing between ignorance" of the defendant and "ignorance" of the cause of action itself "appears to be premised on the commonsense assumption that once the plaintiff is aware of" the latter, he "normally" has "sufficient opportunity," within the "applicable limitations period," "to discover the identity" of the former. (*Ibid.*) He may "often effectively extend[]" the limitations period in question "by the filing" and amendment "of a Doe complaint" and invocation of the relation-back doctrine. (*Ibid.*) "Where" he knows the "identity of at least one defendant . . . , [he] must" proceed thus. (*Id.* at p. 937.)

## III

██  Before we turn to the decision of the Court of Appeal reversing the judgment of the superior court on its order granting Upjohn's motion for summary judgment against the operative complaint, we consider the appropriateness of the decision itself in light of two questions that we propounded to the parties prior to oral argument.

The two questions concern the appeal from the superior court's judgment. They do not, however, go to such fundamental issues as whether the Norgarts were aggrieved parties or whether the Court of Appeal had appellate jurisdiction. For it is plain that the Norgarts were such parties, since they had an "interest recognized by law in the subject matter of the judgment, which interest [was] injuriously affected" thereby (*Estate of Colton* (1912) 164 Cal. 1, 5 [127 P. 643]), and that the Court of Appeal had such jurisdiction, since it had before it a judgment that a statute (Code Civ. Proc., § 904.1, subd. (a)(1)) made appealable (9 Witkin, Cal. Procedure (4th Ed. 1997) Appeal, § 15, p. 74).

Rather, the first question that we propounded is whether the superior court's judgment was nonappealable under what in *Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810, 817 [226 Cal.Rptr. 81, 718 P.2d 68]

---

[4]See *Jolly* v. *Eli Lilly & Co., supra*, 44 Cal.3d at page 1114 and footnote 13: "[T]he limitations period begins when the plaintiff suspects, or should suspect, that [he] has been wronged," even if he does "not know *whom* to sue." (Italics in original.)

(hereafter sometimes *Building Industry Assn.*) we called the "rule" that a "party may not appeal a consent judgment."

At the outset, we should state what we mean by "consent judgment." Apparently, our law does not give the phrase a definition. Other jurisdictions do, using it to refer to a judgment entered by a court under the authority of, and in accordance with, the contractual agreement of the parties (see, e.g., *Community Realty Management* v. *Harris* (1998) 155 N.J. 212, 226 [714 A.2d 282, 288-289]), intended to settle their dispute fully and finally (see, e.g., *People Who Care* v. *Rockford Bd. of Educ.* (7th Cir. 1995) 68 F.3d 172, 178). Our law seems to understand the phrase similarly. (See Bus. & Prof. Code, § 16750, subd. (g) [impliedly defining a "consent judgment" as a "settlement" of an "action"].)

Relying on decisions including *Mecham* v. *McKay* (1869) 37 Cal. 154 (hereafter sometimes *Mecham*), we referred in *Building Industry Assn.* to the "rule" that a "party may not appeal a consent judgment." (*Building Industry Assn.* v. *City of Camarillo*, *supra*, 41 Cal.3d at p. 817.) Also relying on *Mecham*, we noted in *Building Industry Assn.* that there existed at least one "exception," namely, that "[i]f consent was merely given to facilitate an appeal following adverse determination of a critical issue, the party will not lose his right to be heard on appeal." (*Building Industry Assn.* v. *City of Camarillo*, *supra*, 41 Cal.3d at p. 817.) In *Connolly* v. *County of Orange* (1992) 1 Cal.4th 1105 [4 Cal.Rptr.2d 857, 824 P.2d 663], we, in part, paraphrased and, in part, quoted *Building Industry Assn.*: "Although a consent . . . judgment is not normally appealable, an exception is recognized when 'consent was merely given to facilitate an appeal following adverse determination of a critical issue.' " (*Connolly* v. *County of Orange*, *supra*, 1 Cal.4th at p. 1111.) For, in the words of *Building Industry Assn.* itself, "it is 'wasteful of trial court time' to require the plaintiff to undergo a probably unsuccessful . . . trial merely to obtain an appealable judgment." (*Building Industry Assn.* v. *City of Camarillo*, *supra*, 41 Cal.3d at p. 817.)

■ In *Mecham*, which is the seminal decision in this area, we explained both the rule and the exception and their underlying rationale:

"We have several times decided that we will not review, on appeal, judgments and orders entered by consent. [Citations.]

"These decisions proceed on the theory that by consenting to the judgment or order the party expressly waives all objection to it, and cannot be allowed afterwards, on appeal, to question its propriety, because by consenting to it he has abandoned all opposition or exception to it.

"We are not inclined to retract or modify this proposition, but it is to be limited to cases wherein it does not appear from the record that the consent was given only *pro forma* to facilitate an appeal, and with the understanding on both sides that the party did not thereby intend to abandon his right to be heard on the appeal in opposition to the judgment or order. In other words, we will construe the stipulation according to the intention and understanding of the parties at the time, and give effect to it accordingly. If it appears from the record that it was intended by the parties to be only a *pro forma* judgment or order entered by consent for the mere purpose of hastening an appeal, and with no intention to waive an exception thereto, it would be a somewhat rigid ruling to give to the stipulation a conclusive effect not contemplated by the parties. We adopt the more liberal practice of construing the stipulation as the parties understood it at the time." (*Mecham* v. *McKay, supra*, 37 Cal. at pp. 158-159.)

It is evident that there is no conflict between the rationale underlying the rule and the exception, on the one side, and the rule and the exception themselves, on the other. The rationale turns on the intent of the parties *either* to settle their dispute fully and finally *or* merely to hasten its transfer from the trial court to the appellate court. The rule covers cases in which the parties intended a full and final settlement of their dispute, and the exception covers those in which they intended merely a hastening of its trial-court to appellate-court transfer.

■ Let us assume for argument's sake that the judgment in favor of Upjohn and against the Norgarts was a "consent judgment" properly so called—notwithstanding, for example, the fact that, on its face, the parties' stipulation relating to the superior court's order granting Upjohn's summary judgment motion against the operative complaint was intended not to settle their dispute fully and finally, but merely to hasten its transfer from the superior court to the Court of Appeal.

Even on such an assumption, we would have to answer "no" to the question whether the superior court's judgment was nonappealable under the rule.

That the Norgarts' appeal is *not* barred is compelled by consideration of the rationale underlying the rule and the exception—which, as stated, turns on the intent of the parties *either* to settle their dispute fully and finally *or* merely to hasten its transfer from the trial court to the appellate court. By "consenting" to the order granting Upjohn's motion for summary motion against the operative complaint and to the judgment entered in accordance therewith, the Norgarts did not "waive" any "objection" thereto, "expressly"

or otherwise. (*Mecham* v. *McKay, supra,* 37 Cal. at pp. 158-159.) It "appear[s] from the record"—indeed, practically from the face of the stipulation—"that the consent was given only *pro forma* to facilitate an appeal, and with the understanding" on the part of both Upjohn and the Norgarts, and also on the part of the superior court, that the Norgarts "did not thereby intend to abandon [their] right to be heard on the appeal in opposition to the judgment [and] order." (*Id.* at p. 159.) We should "construe the stipulation according to the intention and understanding of the parties at the time, and give it effect accordingly." (*Ibid.*)

That the Norgarts' appeal is *not* barred is also compelled by consideration solely of the rule and the exception. The rule is not applicable. Since we decided *Mecham* more than 130 years ago, the rule has expressly been "limited to cases wherein it does not appear from the record that the consent was given only *pro forma* to facilitate an appeal, and with the understanding on both sides that the party did not thereby intend to abandon his right to be heard on the appeal in opposition to the judgment or order." (*Mecham* v. *McKay, supra,* 37 Cal. at p. 159.) In this case, as we explained in the preceding paragraph, it does, in fact, so appear. Just as the rule is not applicable, the exception is. The Norgarts gave their "consent" "following adverse determination of a critical issue" in Upjohn's favor (*Building Industry Assn.* v. *City of Camarillo, supra,* 41 Cal.3d at p. 817), specifically, "following" the Court of Appeal's "adverse determination" of the "critical issue" of the statute of limitations in *Bristol-Myers Squibb.* If "it is 'wasteful of trial court time' to require the plaintiff to undergo a probably unsuccessful . . . trial merely to obtain an appealable judgment" (*ibid.*)—and indeed it is—it is wasteful no matter what the cause of the probable lack of success. That is true if the "adverse determination" in question is one by the trial court, even though such a decision may be revisited by the trial court itself before it exerts any effect. It is true, a fortiori, if the "adverse determination" in question is one by an appellate court, in the same action or another, inasmuch as such a decision is beyond the trial court's power to change. Be that as it may, any "adverse determination" of this sort is not a legal condition that defines the exception, but only a factual circumstance that may happen to accompany, and explain, the plaintiff's consent to an unfavorable judgment or order. For it is "accidental" *why* the plaintiff might desire "to facilitate an appeal." (*Ibid.*) It is "essential," however, *that* the plaintiff actually so desire. There is no question that the Norgarts harbored such a desire.

█    The second question that we propounded is whether the so-called "doctrine of invited error" barred the Norgarts from complaining on appeal about the superior court's order granting Upjohn's summary judgment motion against the operative complaint.

■ The "doctrine of invited error" is an "application of the estoppel principle": "Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal" on appeal. (9 Witkin, Cal. Procedure, *supra*, Appeal, § 383, p. 434, italics omitted.) We said as much in *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 420-421 [185 Cal.Rptr. 654, 650 P.2d 1171]. At bottom, the doctrine rests on the purpose of the principle, which is to prevent a party from misleading the trial court and then profiting therefrom in the appellate court. (See, e.g., *People* v. *Upshaw* (1974) 13 Cal.3d 29, 34 [117 Cal.Rptr. 668, 528 P.2d 756]; *Jentick* v. *Pacific Gas & Elec. Co.* (1941) 18 Cal.2d 117, 121 [114 P.2d 343]; see also 9 Witkin, Cal. Procedure (4th ed., 1999 supp.) Appeal, § 383, p. 62; cf. *Myers Building Industries, Ltd.* v. *Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 960, fn. 8 [17 Cal.Rptr.2d 242] [speaking of a party misleading the jury].) In light of this principle, as we explained in *Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202 [285 Cal.Rptr. 99, 814 P.2d 1341] (hereafter sometimes *Mary M.*), the doctrine has not been extended to situations wherein a party may be deemed to have induced the commission of error, but did not in fact mislead the trial court in any way—as where a party " ' "endeavor[s] to make the best of a bad situation for which [it] was not responsible." ' " (*Id.* at p. 213.)

■ Let us assume for argument's sake that the stipulation between the Norgarts and Upjohn relating to the superior court's order granting the latter's summary judgment motion against the operative complaint may be deemed to have induced the commission of error in the form of the ruling in question.

Even on such an assumption, we would have to answer "no" to the question whether the doctrine of invited error barred the Norgarts from complaining on appeal about the superior court's order.

The Norgarts simply did not mislead the superior court in any way. It was apparent to all that the Norgarts entered into the stipulation relating to the superior court's order in order to hasten review in the Court of Appeal. Specifically, it was apparent to all that they entered into the stipulation relating to the ruling in question *in order to complain thereof before the Court of Appeal*. In the words of *Mary M.*, they were doing more, and nothing less, than " ' "endeavoring to make the best of a bad situation for which [they were] was not responsible" ' " (*Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 213)—namely, the unfavorable result at trial that would have been compelled by *Bristol-Myers Squibb.*

## IV

We now turn to the decision of the Court of Appeal reversing the judgment of the superior court on its order granting Upjohn's motion for summary judgment against the operative complaint.

■ At the threshold, we believe that the Court of Appeal did not err when it reviewed the superior court's order granting Upjohn's summary judgment motion independently. "Rulings on such motions are examined de novo." (*Buss* v. *Superior Court* (1997) 16 Cal.4th 35, 60 [65 Cal.Rptr.2d 366, 939 P.2d 766].) Including, as here, rulings granting such motions. (E.g., *Silva* v. *Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261 [76 Cal.Rptr.2d 382]; *Lenane* v. *Continental Maritime of San Diego, Inc.* (1998) 61 Cal.App.4th 1073, 1079 [72 Cal.Rptr.2d 121].)

■ On the merits, however, we believe that the Court of Appeal did indeed err when it overturned the superior court's order granting Upjohn's summary judgment motion.

Under the statute of limitations, a plaintiff must bring a cause of action for wrongful death within one year of accrual. (Code Civ. Proc., § 340, subd. (3).) The limitations period is thus defined by the Legislature. Not defined by it is the date of accrual. It cannot be allowed to remain so. By its omission, the Legislature has compelled the courts to proceed. Hence, it may be deemed to have authorized them to do so. It has evidently "chosen to defer to judicial experience and to repose with the judiciary the rendition of rules for the accrual of" a wrongful death cause of action. (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand, supra,* 6 Cal.3d at p. 192.)

Viewing the matter thus, we believe that, at least as a usual matter, the general rule for defining the accrual of a cause of action should govern a cause of action for wrongful death. That means that, at least as a usual matter, the date of accrual of a cause of action for wrongful death is the date of death. (*Larcher* v. *Wanless* (1976) 18 Cal.3d 646, 656-657 [135 Cal.Rptr. 75, 557 P.2d 507].) For it is only on the date of death that a wrongful death cause of action becomes complete with all of its elements, which, as stated, include (1) a "wrongful act or neglect" on the part of one or more persons that (2) "cause[s]" (3) the "death of [another] person" (Code Civ. Proc., § 377.60).

But, for purposes of discussion only, we shall assume that the discovery rule may govern the date of accrual of a cause of action for wrongful death when the "plaintiff . . . is 'blamelessly ignorant' of his cause of action

. . . ." (*Frederick* v. *Calbio Pharmaceuticals* (1979) 89 Cal.App.3d 49, 53-54 [152 Cal.Rptr. 292]; see generally, *id.* at pp. 53-58 [so holding as to a cause of action for wrongful death against a manufacturer and distributor of pharmaceutical products]; cf. *Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at p. 1109 [noting, without expressly approving, the "agree[ment]" of the parties therein that the discovery rule governed the date of accrual of a cause of action for personal injury]; *Bristol-Myers Squibb Co.* v. *Superior Court, supra,* 32 Cal.App.4th at p. 963 [so holding].) That means that we shall assume that, under such circumstances, the date of accrual of a wrongful death cause of action is the date on which the plaintiff comes at least to suspect, or have reason to suspect, a factual basis for its elements.[5]

With that said, and contrary to the Court of Appeal's conclusion, we are of the view that it is indeed the case that there was no triable issue of material fact and that Upjohn was entitled to judgment as a matter of law based on the statute of limitations.

Under the statute of limitations, the Norgarts had to bring their causes of action for wrongful death within one year of accrual. They did not do so.

Pursuant to the general rule, the Norgarts were too late, exactly five years too late. Their causes of action for wrongful death accrued at Kristi's death on October 16, 1985. But they were not brought until the original complaint was filed on October 16, 1991.

Likewise, pursuant to the discovery rule, the Norgarts were too late, four or five years too late. Their causes of action for wrongful death accrued when they came at least to suspect, or have reason to suspect, a factual basis for their elements, which occurred as early as the date of Kristi's death on October 16, 1985, but no later than some date prior to mid-1986. Nevertheless, they were not brought until the original complaint was filed on October 16, 1991. To explain: Leo admitted that, "[a]t or around the time of Kristi's

---

[5]We observe in passing that, for a cause of action for wrongful death specifically "against a health care provider based upon such person's alleged professional negligence" (Code Civ. Proc., § 340.5)—which the Norgarts did *not* bring in the operative complaint—the statute of limitations incorporates both the general rule for defining the accrual of a cause of action and also the discovery rule as an exception thereto, inasmuch as it generally prescribes a limitations period of three years from the date on which the cause of action becomes complete with all of its elements, that is, the date of death, or a limitations period of one year after the date on which the plaintiff comes at least to suspect, or have reason to suspect, a factual basis therefor, depending on which of the two dates is the earlier. (*Ibid.*) For such a cause of action, the operation of the discovery rule is effectively limited by the operation of the general rule. (See, e.g., *Brown* v. *Bleiberg* (1982) 32 Cal.3d 426, 432 [186 Cal.Rptr. 228, 651 P.2d 815].) Whether any assumed operation of the discovery rule should similarly be limited for a cause of action for wrongful death generally is a question we need not, and do not, answer.

death," he suspected that "something wrong" had happened to her to cause her death: he "thought" that "there had to be some reason, other than just herself, that would cause her to commit suicide," that "there had to be some other force or action upon her that caused her to commit suicide . . . ." He thereby impliedly admitted—to quote *Jolly*—that he "suspect[ed] . . . that someone ha[d] done something wrong" to cause her death. (*Jolly* v. *Eli Lilly & Co.*, *supra*, 44 Cal.3d at p. 1110.) He also admitted that, prior to mid-1986, he had formed a belief that an "individual or individuals . . . did something wrong to [her] that caused her to take her own life," and had begun to contemplate bringing an action for wrongful death. He further admitted that the "individual or individuals" in question were her husband Steven, for what he suspected was physical abuse, and her psychiatrist Dr. Apostle, for what he suspected was professional negligence. He thereby expressly admitted—to quote *Jolly* again—that he "suspect[ed] . . . that someone," indeed two specific persons, "ha[d] done something wrong" to cause her death. (*Jolly* v. *Eli Lilly & Co.*, *supra*, 44 Cal.3d at p. 1110.)

Against our conclusion, the Norgarts argue, in effect, that Upjohn was not entitled to judgment as a matter of law based on the statute of limitations. They assert that there is conflict between the holding of the Court of Appeal in *Bristol-Myers Squibb*—under the discovery rule, a plaintiff discovers, or has reason to discover, a cause of action as to all defendants when he at least suspects, or has reason to suspect, a factual basis for its elements as to any defendant—and the holding of the Court of Appeal below—under the discovery rule, when "there are potentially multiple" "unrelated" "concurring causes," a plaintiff discovers, or has reason to discover, a cause of action "based on a particular act of wrongdoing" by a particular defendant, only when he at least suspects, or has reason to suspect, that act of wrongdoing by that defendant. They then assert this conflict should be resolving in favor of the latter and against the former.

In addressing the Norgarts' argument, we find that we need not resolve any conflict between the holding of the Court of Appeal in *Bristol-Myers Squibb* and the holding of the Court of Appeal below. That is because, although the former is plainly not helpful to their position, the latter shows itself to be no better.

At the outset, the holding of the Court of Appeal below is inapplicable on its own terms. It states as its condition that the "potentially multiple concurring causes" are "unrelated." That condition is not satisfied. Under the facts that the Norgarts and Upjohn effectively bound themselves to by their stipulation as undisputed, any "potentially multiple concurring causes" were *not* "unrelated." Under those facts as illuminated by Leo's admissions,

Kristi's death was possibly connected to the following, each being related the one to the other through her depression and suicide: her husband Steven and his suspected physical abuse; her psychiatrist Dr. Apostle and his suspected professional negligence, specifically, his failure to prescribe lithium carbonate; her general practitioner Dr. Greensweig and *his* professional negligence, specifically, his prescription of Halcion; and Upjohn and its manufacturing and distributing of the drug. The Court of Appeal expressed concern that a "plaintiff's suspicion as to one . . . act of wrongdoing does not necessarily lead the plaintiff to suspect another . . . act of wrongdoing." But Leo's suspicion, as he himself admitted, actually did so.

Even if it were not inapplicable on its own terms, the holding of the Court of Appeal below would prove to be of no benefit to the Norgarts. If a plaintiff discovered, or had reason to discover, a cause of action "based on a particular act of wrongdoing" by a particular defendant, only when he at least suspected, or had reason to suspect, that act of wrongdoing by that defendant, then the Norgarts had reason to discover their causes of action for wrongful death against Upjohn for manufacturing and distributing Halcion soon after Kristi's death on October 16, 1985, when they came at least to have reason to suspect the drug and the company with regard thereto. For soon after her death, they learned of her depression and suicide attempts, once by overdose of unidentified prescription drugs, dating back to April 1984; they also learned of her depression and suicide by overdose of prescription drugs, including Halcion, on October 16, 1985. And soon after her death, Leo having undertaken an investigation into its cause, they had reason to learn of a possible connection to Halcion and Upjohn. For such a possible connection was disclosed by the package insert that the company had prepared for the drug, which, at all pertinent times, contained the following statement: "PRECAUTIONS"—"Caution should be exercised if HALCION is prescribed to patients with signs or symptoms of depression which could be intensified by hypnotic drugs. Suicidal tendencies may be present in such patients and protective measures may be required. Intentional overdosage is more common in these patients, and the least amount of drug that is feasible should be available to the patient at any one time." We recognize that the Court of Appeal declined to take the package insert into account. It asserted that it was "only before the court on Upjohn's motion to reconsider the denial of its first motion for summary judgment and was not before the court on the motion that was granted." That is not the case. The summary judgment motion that the superior court granted was against the operative complaint. The package insert was attached as part thereof. Upjohn was entitled to rely on its contents. (*Parker* v. *Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181 [89 Cal.Rptr. 737, 474 P.2d 689, 44 A.L.R.3d 615].)

In light of our conclusion, the Norgarts did not need the opportunity mentioned by *Jolly* "effectively [to] enlarg[e] the . . . limitations period for three years" through the filing and amendment of a Doe complaint and the invocation of the relation-back doctrine. (*Jolly* v. *Eli Lilly & Co.*, *supra*, 44 Cal.3d at p. 1118.) Because they did not need it, we are not required to determine whether it would indeed have been available. For, as noted, *Bernson* implies that it may "often" be available as a matter of fact, but does not state that it must always be available as a matter of law. (*Bernson* v. *Browning-Ferris Industries*, *supra*, 7 Cal.4th at p. 932.) But, even though not required to determine its availability, we will, because the Court of Appeal did so. It resolved the issue in the negative. In contrast, we shall resolve it in the affirmative.

Under the facts that the Norgarts and Upjohn effectively bound themselves to by their stipulation as undisputed, prior to mid-1986, Leo had formed a belief that an "individual or individuals . . . did something wrong to [Kristi] that caused her to take her own life," and had begun to contemplate bringing an action for wrongful death. The "individual or individuals" in question were her husband Steven, for what he suspected was physical abuse, and her psychiatrist Dr. Apostle, for what he suspected was professional negligence.

Had the Norgarts brought one or more causes of action for wrongful death against Steven and Dr. Apostle by filing a Doe complaint, within the one-year limitations period applicable thereto, on or before October 16, 1986, they could have amended that complaint to substitute Upjohn for one of the Does, within the three-year period effectively enlarging the limitations period, on or before October 16, 1989—by which time, we may judicially notice (Evid. Code, §§ 452, subd. (h), 459, subd. (a)),[6] a controversy about Upjohn's drug Halcion had arisen in the popular press.[7]

The amended complaint would have related back to the original one. The relation-back doctrine requires that the amended complaint must

---

[6]A "reviewing court may take judicial notice" (Evid. Code, § 459, subd. (a)) of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy" (*id.*, § 452, subd. (h)).

[7]We dismiss any claim by the Norgarts that they *should not* have brought any cause of action for wrongful death against either Steven or Dr. Apostle by filing a Doe complaint, within the one-year limitations period applicable thereto, on or before October 16, 1986, on the ground that each was "innocent." Under the facts that the Norgarts and Upjohn effectively bound themselves to by their stipulation as undisputed, no such "innocence" appears. We also dismiss any claim by the Norgarts that they *could not* have amended any Doe complaint of this sort to substitute Upjohn for one of the Does, within the three-year period effectively enlarging the limitations period, on or before October 16, 1989, on the ground that it was not yet the object of any kind of actual or constructive knowledge or suspicion in this regard. By

(1) rest on the *same general set of facts*, (2) involve the *same injury*, and (3) refer to the *same instrumentality*, as the original one. (*Barrington* v. *A.H. Robins Co.*, *supra*, 39 Cal.3d at pp. 150-151; *Smeltzley* v. *Nicholson Mfg. Co.* (1977) 18 Cal.3d 932, 934-940 [136 Cal.Rptr. 269, 559 P.2d 624, 85 A.L.R.3d 121].)

■■■ The Court of Appeal did not make any assertion that the same-injury requirement would not have been met. Nor could it. Both the original and amended complaints would have involved *Kristi's wrongful death* by means of an intentional overdose of prescription drugs, including Halcion, arising out of depression. (See *Rowland* v. *Superior Court* (1985) 171 Cal.App.3d 1214, 1217-1218 [217 Cal.Rptr. 786].)

Neither did the Court of Appeal make any assertion that the same-instrumentality requirement would not have been met. Nor could it. Both the original and amended complaints would have referred to Kristi's wrongful death *by means of an intentional overdose of prescription drugs, including Halcion*, arising out of depression. (See *Smeltzley* v. *Nicholson Mfg. Co.*, *supra*, 18 Cal.3d at pp. 936-938.)

But the Court of Appeal did indeed make an assertion that the same-general-set-of-facts requirement would not have been met. It did so, however, entirely without basis. Both the original and amended complaints would have referred to *Kristi's wrongful death by means of an intentional overdose of prescription drugs, including Halcion, arising out of depression.* (See *Grudt* v. *City of Los Angeles* (1970) 2 Cal.3d 575, 583-585 [86 Cal.Rptr. 465, 468 P.2d 825].)

We reject any argument by the Norgarts that Upjohn was not entitled to judgment as a matter of law based on the statute of limitations because of an asserted estoppel through the doctrine of fraudulent concealment. Under the facts that the Norgarts and Upjohn effectively bound themselves to by their stipulation as undisputed, fraudulent concealment *is not even implicated.*

We also reject any argument by the Norgarts that Upjohn was not entitled to judgment as a matter of law based on the statute of limitations because of the asserted absence of prejudice attributable to the passage of time. Legally, however, prejudice is immaterial for present purposes. (E.g., *LaManna* v. *Stewart* (1975) 13 Cal.3d 413, 423, fn. 9 [118 Cal.Rptr. 761, 530 P.2d 1073]; *State Farm Fire & Casualty Co.* v. *Superior Court* (1989) 210 Cal.App.3d 604, 612 [258 Cal.Rptr. 413].) Factually, prejudice cannot be dismissed out

that time, as stated in the text, a controversy about Upjohn's drug Halcion had arisen in the popular press.

of hand. Passage of time threatens the loss of evidence, the fading of memories, and the disappearance of witnesses. (E.g., *Jolly* v. *Eli Lilly & Co.,* *supra,* 44 Cal.3d at p. 1124.) Over the period of almost 14 years since Kristi committed suicide, it has likely made good its threat in many instances, and has surely done so in one, with fatal effect: not long before we granted review, Leo himself died. The Norgarts attempt to shift the responsibility for the passage of time from their own shoulders onto Upjohn's through the doctrine of fraudulent concealment. But—again—under the facts that the Norgarts and Upjohn effectively bound themselves to by their stipulation as undisputed, fraudulent concealment is not even implicated.

Finally, we reject any argument by the Norgarts that Upjohn was not entitled to judgment as a matter of law based on the statute of limitations because of the asserted meritoriousness of their causes of action for wrongful death. But, as stated, the statute of limitations "necessarily fix[es]" a "definite period[] of time" (*California Sav. etc. Soc.* v. *Culver, supra,* 127 Cal. at p. 110), and hence operates conclusively across-the-board. It does so with respect to *all* causes of action, both those that do not have merit and also those that do. ▌ ▬ ▬ That it may bar meritorious causes of action as well as unmeritorious ones is the "price of the orderly and timely processing of litigation" (*Sanchez* v. *South Hoover Hospital, supra,* 18 Cal.3d at p. 103)—a price that may be high, but one that must nevertheless be paid.[8]

## V

For the reasons stated above, we conclude that we must reverse the judgment of the Court of Appeal, and remand the cause to that court for proceedings not inconsistent with this opinion, including review of the superior court's order granting Upjohn's motion for summary judgment against the operative complaint as to the Norgarts' "survival" causes of action for fraud.

It is so ordered.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I agree with the majority that we must reverse the Court of Appeal's decision overturning the trial court's

---

[8]To the extent that *Bristol-Myers Squibb* reads *Jolly* to require that a plaintiff must do more than suspect a factual basis for the elements of a cause of action in order to discover the cause of action—at one point it states that the "formula in *Jolly* is (1) knowledge of [one or more elements], and (2) knowledge of facts creating, or which in a reasonable person would create, a suspicion of [the others]" (*Bristol-Myers Squibb Co.* v. *Superior Court, supra,* 32 Cal.App.4th at p. 965)—it reads it wrong. (See, *ante,* at p. 398, fn. 3.) To that extent, it is disapproved.

summary judgment in defendants' favor, but I do not agree with the majority's reason for doing so.

The majority reverses the Court of Appeal because the majority concludes that defendants are entitled to summary judgment. I concur in reversing the Court of Appeal's judgment, but I do so without deciding the merits of defendants' summary judgment motion. I reject plaintiffs' challenge to the summary judgment ruling because a party may not challenge on appeal a trial court ruling to which the party stipulated. (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 420 [185 Cal.Rptr. 654, 650 P.2d 1171] ["plaintiffs are estopped to complain of the trial court's error because they participated in its commission"]; *Cushman* v. *Cushman* (1960) 178 Cal.App.2d 492, 498 [3 Cal.Rptr. 24] ["one will not be heard to urge error which he is estopped to raise, or which he has waived, by failure to make proper objection, by conduct, by stipulation, or otherwise, in the lower court"]; *Orenstein* v. *United States* (1st Cir. 1951) 191 F.2d 184, 193 ["An appellant will not ordinarily be permitted to complain of an error which he himself invited or which at his instance the court committed."]; *Saxton* v. *Toole* (1992) 240 Ill.App.3d 204, 212 [181 Ill.Dec. 160, 608 N.E.2d 233, 239] ["A party cannot assert as reversible error actions of the trial court which were committed pursuant to that party's stipulation or acquiescence."].) Here, plaintiffs stipulated to the ruling granting defendants' motion for summary judgment after the trial court had issued a tentative decision to *deny* the motion. Under settled law, plaintiffs may not challenge the stipulated ruling granting summary judgment.

Had the parties not stipulated to the ruling granting summary judgment, the trial court in all likelihood would have denied the summary judgment motion, consistent with its tentative ruling. The ruling would not have been appealable because the Legislature has decided not to permit an appeal from an order denying summary judgment (Code Civ. Proc., § 904.1; *Sierra Craft, Inc.* v. *Magnum Enterprises, Inc.* (1998) 64 Cal.App.4th 1252, 1256 [75 Cal.Rptr.2d 681]), although a party may seek immediate appellate review by petitioning the Court of Appeal for a peremptory writ (Code Civ. Proc., § 437c, subd. (*l*); *Whitney's at the Beach* v. *Superior Court* (1970) 3 Cal.App.3d 258, 266 [83 Cal.Rptr. 237]).

Plaintiffs argue, in effect, that exceptional circumstances were present here warranting immediate appellate review because a recent Court of Appeal decision had established a precedent that, if valid and applicable, would have required a determination that their action was barred by the statute of limitations, making a trial on the merits a waste of judicial and litigant resources. Perhaps so. But the question whether immediate review is

necessary to "prevent a needless and expensive trial and reversal" (*Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 894 [157 Cal.Rptr. 693, 598 P.2d 854]) is one for the Court of Appeal to answer in exercising its discretionary writ review authority, not one for the parties to arrogate to themselves by stipulating to a ruling that the trial court, as its tentative ruling shows, probably would not otherwise have made. To permit the parties to manufacture appellate jurisdiction in this way subverts the Legislature's determination making summary judgment denials subject to discretionary appellate review by writ petition rather than appealable as a matter of right.

In my view, the parties may not by stipulation artificially convert a nonappealable interim ruling denying summary judgment into an appealable final judgment. Because the majority concludes otherwise, I do not join the majority opinion.